UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION


IBERIA CREDIT BUREAU, INC., ET AL          CIVIL ACTION

VERSUS                                     NO.  6:01-2148

CINGULAR WIRELESS, ET AL                   JUDGE LEMELLE


## ORDER AND REASONS

Defendant, TeleCorp Communications, Inc. d/b/a SunCom ("SunCom") files a Renewed Motion for Partial Summary Judgment and Dismissal (Rec. Doc. No. 372) on the grounds of federal preemption and the filed tariff doctrine.  The motion is opposed by Plaintiff Claudia Fontenot (Rec. Doc. No. 319, Rec. Doc. No. 406).  For the following reasons, **IT IS ORDERED** that the instant motion is **DENIED**.

**PERTINENT FACTS:**

Plaintiffs initially filed this class action on September 11, 2001, asserting various breach of contract claims against several wireless communication service providers.[1]  Plaintiffs allege that Defendants failed to "disclose the true nature of the billing and/or trade practices, each of which represents a breach of contract. . . ."[2]  At issue in this motion are the claims and defenses of Plaintiff Fontenot and Defendant SunCom. Fontenot is the only plaintiff in this suit who did business with SunCom, and

---

[1] Rec. Doc. No. 1.
[2] Rec. Doc. No. 213, p.6-7.

Fontenot and SunCom are the only parties involved in this motion. However, the legal conclusions regarding preemption and the tariff doctrine are applicable to all parties, unless noted otherwise.

Plaintiff alleges that she contracted for cellular service with SunCom in 2000.[3]  According to Plaintiff, SunCom promised her 200 talking minutes.[4]  Plaintiff alleges that Defendant breached its oral agreement for cellular service by failing to inform her that the company participated in such practices as rounding up calling time to the next full minute and charging for airtime during non-communication time ("send to end" billing). As a result, Plaintiff got less minutes than what she was promised and than she paid for.[5]  There is a dispute of the facts as to whether or not the contract was oral or written, the terms of the contract, and whether or not Plaintiff was aware of Defendant's billing practices of rounding up and send to end billing.

After several years' worth of pretrial motions and discovery disputes, only two defendants remain in the case, including SunCom. On January 21, 2005, the Court denied without prejudice the motions for summary judgment filed by the remaining defendants, and

---

[3] Plaintiff states that she is unsure whether she had a contract with SunCom because she did not sign anything at the time of signing up.  Rec. Doc. No. 372-5, p.9.  However, it appears from the text of the deposition that Plaintiff does not fully understand the concept of contracts, so this should not be taken literally.
[4] Rec. Doc. No. 372-5, p.4.
[5] Rec. Doc. No. 372-2, p.8; Rec. Doc. No. 213 p.8; Rec. Doc. No. 406, p.6.

directed the parties to develop a plan of discovery on the issues relative to the defendants' defenses based on federal preemption and the filed tariff doctrine.[6]  Discovery was limited to these summary judgment issues of law.  SunCom now renews its previous Motion for Summary Judgment and Dismissal on these same grounds: 1) the Federal Communications Act preempts challenges as to the reasonableness of wireless carriers' rates and rate practices, including practices such as rounding up and send to end billing; and 2) even if the claims are not preempted, the filed tariff doctrine prohibits litigation of non-rate claims in Louisiana.[7] Defendant also argues Plaintiffs can no longer forestall summary judgment by claiming that they need more time for discovery.  This issue was ruled upon in the Court's Order dated May 19, 2009, and therefore it does not need to be addressed here.[8]

**CONTENTIONS OF MOVANT:**

SunCom argues that partial summary judgment disposal of Fontenot's state claim is proper because it is federally preempted by § 332 of the Federal Communications Act.[9]  Section 332 states (and has been interpreted to mean) that no state or local government has the authority to regulate rates or rate practices of wireless carriers.  SunCom contends that the Court's judgment of

---

[6]Rec. Doc. No. 336; Transcript of Hearing of January 21, 2005 at 56, 94.
[7]Rec. Doc. No. 372.
[8]Rec. Doc. No. 402.
[9] Rec. Doc. No. 372-2, p.21.

the case, if it were to go to trial, would constitute a regulation of rates and thus should be preempted.  SunCom also argues that in order for the Court to make its ruling, it first must determine the reasonableness of the rates, which is disallowed by § 332.[10]

In the alternative, SunCom argues that if the Court should find the claim not to be preempted by the Federal Communications Act, then they are foreclosed by Louisiana's filed tariff doctrine.[11]  SunCom claims that the filed tariff doctrine bars consumer suits for damages arising out of claims involving other terms and conditions.[12]  According to SunCom, the doctrine presumes that customers have knowledge of wireless providers' rates and billing practices that are filed as tariffs, and therefore cannot claim injury or damages.[13]

**CONTENTIONS OF RESPONDENT:**

Plaintiff contends that their breach of contract claim is not preempted by § 332, as state law claims stemming from state contract or consumer fraud laws governing disclosure of rates and rate practices are not preempted.[14]  Plaintiff concedes that state courts have no authority to determine the reasonableness of rates or to participate in rate setting, however, Plaintiff contends that this action is strictly a matter of contract enforcement, and does

---

[10] *Id.* at p.23.
[11] *Id.* at p.24.
[12] *Id.* at p.26-27.
[13] *Id.* at p.27.
[14] Rec. Doc. No. 319, p.6.

not involve a determination of reasonableness, nor will it set or directly affect rates.  It is Plaintiff's position that this claim will only require the courts to determine the amount of airtime that was promised, and the amount actually provided.[15]

Plaintiff also disagrees with Defendant about the existence and the applicability of the filed tariff doctrine.  Plaintiff claims that this is doctrine invented by the Defendants to circumvent the filed rate doctrine, which does not apply to wireless providers.[16]  Plaintiff alleges that the Defendant's tariff filing with the State is strictly an informational filing with no force of law.[17]  Alternatively, Plaintiff argues that if for some reason the Court does find that the filed tariffs have the force of law, they should not be enforced in this case because Defendant failed to adhere to the terms of the filed tariff, therefore forbidding courts from enforcing it.[18]

**LAW AND ANALYSIS:**

**A.   Standard of Review for Summary Judgment**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322-323 (1986).  A court must be

---

[15] *Id.*
[16] Rec. Doc. No. 406, p.7.
[17] *Id.* at p.8.
[18] Rec. Doc. No. 411-2.

satisfied that no reasonable trier of fact could find for the nonmoving party, or "that the evidence favoring the nonmoving party is insufficient to enable a reasonable juror to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party bears the burden of showing there are no genuine issues of material fact.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *See also Lavespere*, 910 F.2d at 178.  The burden shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.  Background of Federal Communications Act of 1934 and 1993 Amendment**

The Federal Communications Act ("FCA") was first promulgated by Congress in 1934.  47 U.S.C. §§ 151 *et seq*.  The stated purpose of the Act is to regulate wire and radio communication systems to

make available a rapid and efficient world-wide communication system at a reasonable charge.  47 U.S.C. § 151.  The 1934 Act as applied to telephone services remained principally in place until it was amended in 1993.  The 1993 amendment was, in large part, in recognition of the rapid growth of wireless communication methods, in particular cellular phones.  *Ball et al. v. GTE Mobilnet of Cal. et al.*, 81 Cal. App. 4th 529, 533 (2000).  The goal of the amended § 332 was to deregulate commercial mobile radio service ("CMRS") providers to encourage development of mobile services.  H.R. Rep. No. 103-111, 103rd Cong., 1st Sess. 211, 260 (May 25, 1993); 47 U.S.C. § 332.  "Section 332 was designed to promote the CMRS industry's reliance on competitive markets in which private agreements and other contract principles can be enforced." *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17034 ¶ 24 (2000) ("*Wireless Consumers*").  The specific purpose of implementing the preemption clause was to "help promote investment in the wireless infrastructure by preventing burdensome and unnecessary state regulatory practices that impede the federal mandate for regulatory parity."  Second Report and Order, *In re Implementing of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Services*, 9 F.C.C. Rec. 1411, 1411, 1421 (1994). *See also Tenore v. AT&T Wireless Serv.*, 962 P.2d 104, 110 (Wash. 1998).

C.    **Preemption**

### 1. Section 332 and related statutes of the FCA

SunCom asserts that Plaintiff's breach of contract claims necessarily constitute state regulation of rates, which is prohibited by 47 U.S.C. § 332 (c)(3)(A) of the FCA.  That statute provides in pertinent part, "…no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services."  In other words, the Act bars state regulation of the entry of or the rates or rate structures of CMRS providers, while at the same time preserving the right of regulation of the terms and conditions to the states.  *Wireless Consumers*, 15 F.C.C.R. at 17028.  Therefore, the first question to be answered is whether the Plaintiff's claims are either equivalent to rate regulation and thus preempted, or fall under the category of "other terms and conditions" and thus subject to state law.  *Id.*

SunCom correctly contends that the FCA is the exclusive remedy for a claimant seeking a determination of the reasonableness of rates charged for wireless services.  Section 332 (c)(3)(a) bars lawsuits challenging the reasonableness or lawfulness per se of the rates or rate structures of CMRS providers.  *In re Southwestern Bell Mobile Sys., Inc.*, 14 F.C.C.R. 19898, 19901 ¶ 7 (1999)

("*Southwestern Bell*").   47 U.S.C. § 201(b) of the FCA also provides: "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful…"

While § 322(c)(3) preempts the regulation or rates and market entry, the savings provision continues to allow claims that do not fall under the categories of rates and market entry.  The savings clause, set forth in 47 U.S.C.A. § 414, provides, "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." This clause is used to support the notion that statutory fraud and breach of contract remedies, which now exist in state common law, are preserved.

The United States Court of Appeals, Fifth Circuit, has agreed with the Federal Communications Commission's ("FCC") interpretation of § 332(c)(3)(A) providing that "States: (1) in general can never regulate rates and entry requirements for CMRS providers; (2) are free to regulate all other terms and conditions for CMRS providers; (3) may regulate CMRS rates and entry requirements when they have made a substitutability finding in connection with universal service programs, and (4) may also regulate CMRS rates if they petition the FCC and meet certain statutory requirements, including

-9-

either substitutability or unjust market rates." *Texas Office of Public Utilities Counsel, et al. v. FCC*, 183 F. 3d 393, 432 (5th Cir. 1999).

### 2.   Preemption - Generally

SunCom, which seeks to preempt state law, bears a heavy burden of proof.  Preemption is not lightly found. *Wisconsin Publishers Intervenor v. Mortier*, 501 U.S. 597 (1991).  When determining whether federal preemption exists, the "ultimate touchstone" inquiry is whether Congress intended the federal regulation to supersede state law. *Altria Group, Inc. v. Good*, 129 S.Ct. 538 (2008); *Gabarick, et al v. Laurin Maritime (America) Inc., et al.*, 2009 WL 1108906, 7 (E.D.La. April 24, 2009) (slip copy); *Brodie v. TeleCorp Communications, Inc.*, 836 So.2d 646 (5th Cir. 2002). *Altria* provides some general guidance on preemption analysis emphasizing the importance of the purpose of Congress on inquiries into preemptive effect of a statute and noting that "Congress may indicate preemptive intent through a statute's express language or through its structure and purpose." *Gabarick*, 2009 WL 1108906, 7, *citing Altria*, 129 S.Ct. at 543.  "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains. Pre-emptive intent may also be inferred if the scope of the statute indicates that

Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Altria*, 129 S.Ct. at 543. *Altria* continues:

> When addressing questions of express or implied pre-emption, we begin our analysis "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. *Lohr*, 518 U.S., at 485, 116 S.Ct. 2240; see also *Reilly*, 533 U.S., at 541-542, 121 S.Ct. 2404 ("Because 'federal law is said to bar state action in [a] fiel[d] of traditional state regulation,' namely, advertising, we 'wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress' " (citation omitted)). Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).

*Id.*

### 3. Recent Developments in Preemption

On May 20, 2009, President Obama released a memorandum to the heads of executive departments and agencies concerning preemption. Memorandum on Preemption, 74 FR 24693, 2009 WL 1422223 (May 20, 2009). The purpose of the memorandum was to clarify that the new administration would not be as liberal as the past administration in affording preemption without explicit language from Congress or an otherwise sufficient basis. *Id.* According to President Obama, "preemption of State law by executive departments and agencies

should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption." *Id.* The memorandum outlines steps to determine whether there is a sufficient legal basis:

> 1. Heads of departments and agencies should not include in regulatory preambles statements that the department or agency intends to preempt State law through the regulation except where preemption provisions are also included in the codified regulation.
>
> 2. Heads of departments and agencies should not include preemption provisions in codified regulations except where such provisions would be justified under legal principles governing preemption, including the principles outlined in <u>Executive Order 13132</u>.
>
> 3. Heads of departments and agencies should review regulations issued within the past 10 years that contain statements in regulatory preambles or codified provisions intended by the department or agency to preempt State law, in order to decide whether such statements or provisions are justified under applicable legal principles governing preemption. Where the head of a department or agency determines that a regulatory statement of preemption or codified regulatory provision cannot be so justified, the head of that department or agency should initiate appropriate action, which may include amendment of the relevant regulation.

*Id*. at 24693-94. Furthermore, Executive Order No. 13,132 ("Federalism") provides special requirements for preemption:

> Sec. 4. Special Requirements for Preemption. Agencies, in taking action that preempts state law, shall act in strict accordance with governing law.
>
> (a) Agencies shall construe, in regulations and otherwise, a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute.

(b) Where a Federal statute does not preempt State law (as addressed in subsection (a) of this section), agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rulemaking only when the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute or there is clear evidence to conclude that the Congress intended the agency to have the authority to preempt State law.

(c) *Any regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated.*

64 C.F.R. 43255, 43257 (Aug. 4, 1999) (emphasis added).  The above guidelines set out by the Executive Department call for a narrow reading of preemption provisions.

### 4.  Preemption of State Law Claims Under the FCA

When interpreted narrowly, the objectives of the FCA, specifically with its implementation of the 1993 amendments of § 332, do not call for preemption of contractual state law claims such as the one facing us.  In fact, enforcement of contracts through a monetary remedy is compatible with a free (deregulated) market.  *Wireless Consumers*, 15 F.C.C.R. at 10734 ¶ 24.  Congress could have easily chosen to preempt all state law claims by stating that §332 preempted all state laws that *related* to rates, but instead it chose to preempt only those *regulating* rates and market entry.  *See Tenore*, 962 P.2d at 112, n. 71.  The promulgation of this claim in court will not go against the objectives of the

statute, therefore, it should not be preempted.

It is well settled that state law claims stemming from state contract or consumer fraud laws governing disclosure of rates and rate practices are not generally preempted under §332. *Wireless Consumers*, 15 F.C.C.R. at 17028 ¶ 14; *Southwestern Bell*, 14 F.C.C.R. at 19908 ¶ 23.   In *Southwestern Bell*, the FCC declared that the legislative history of the FCA supports this notion.[19] 14 F.C.C.R. at 19901 ¶ 7; *Moriconi v. AT&T Wireless PCS*, 280 F.Supp.2d 867 (E.D. Ark. 2003).  The amended language of § 332 granting the States the right to regulate "other terms and conditions" was enacted by The House Report on the Omnibus Budget Reconciliation Act of 1993, which states that, "[by] 'terms and conditions,' the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters. . . ." H.R. Rep. No. 103-111, 103rd Cong., 1st Sess. 211, 261 (May 25, 1993).  Congress' intent for the States to retain authority to regulate claims concerning other terms and conditions is also clear from the statutory text and structure. *Moriconi*, 280 F.Supp. at 874.  Aside from express granting of power over "other terms and conditions," § 332(c)(3)(A) even contemplates that states may be granted permission to even regulate rates in

---

[19] Opinions of the FCC are entitled to deference.  *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1073 (7th Cir. 2004); *City of Chicago v. F.C.C.*, 199 F.3d 424 (7th Cir. 1999); *Christensen v. Harris County*, 529 U.S. 576 (2000); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

some instances: "[A] State may petition the Commission for authority to regulate the rates for any commercial mobile service. . ." While § 332 expressly preempts any state regulation of rates or market entry, the savings clause in § 414 (*supra,* stating that the Act shall not abridge existing common law or statutory remedies) indicates that Congress did not intend complete preemption. *Geier v. Am. Honda Mtr. Co., Inc*., 529 U.S. 861, 868 (2000) ("savings clause assumes that there are some significant number of common-law liability cases to save."). Together, the statutory language, the legislative history, and the savings clause suggest that it was Congress' intent that consumers would retain their state law cause of action for breach of contract and statutory fraud. Defendant has failed to point out sufficient evidence of Congress' intent for § 332 to preempt these state law claims.

Another seminal FCC ruling, *In the Matter of Wireless Consumers Alliance*, further explored the issue of preemption. 15 F.C.C.R. 17021. The FCC recognized that state law claims are preempted when the court must determine whether either 1) the price charged is unreasonable, or 2) the court must set a price for a service. 15 F.C.C.R. at 17035 ¶ 25. The issue in *Wireless Consumers* was whether damage awards against CMRS providers based on state tort or contract claims were preempted by § 332. The Commission disagreed that a finding of monetary liability was a determination that the service was inadequate for the charge, and

hence a finding that the charge was unreasonable. *Id.* As Plaintiff correctly points out, the FCC made it clear that a contract dispute as to what the parties contracted for is not automatically a "challenge to the rates" that would be preempted:

> On the other hand, a case may present a question of whether a CMRS service had indeed been provided in accordance with the terms and conditions of a contract or in accordance with the promises included in the CMRS carrier's advertising. Such a case could present breach of contract or false advertising claims appropriately reviewable by a state court. In such a situation, a court need not rule on the reasonableness of the CMRS carrier's charges in order to calculate compensation for the injury that was caused, even though it could be appropriate for it to take the price charged into consideration in calculating damages. *In our view, the court would not be making a finding on the reasonableness of the price charged but would be examining whether under state law, there was a difference between promise and performance.*

*Id.,* 17035 ¶ 26. (emphasis added)(footnotes omitted).

### 5. Analysis

Defendant's argument that Plaintiff's breach of contract claims are in fact disguised attacks on the reasonableness of the rates charged for the service should be rejected. The question presented is whether the service provided by Defendant was in accordance with the terms and conditions of the contract. Plaintiff claims that she was orally promised a certain amount of minutes, only to later discover that she did not in fact receive those minutes. This is clearly an analysis of whether, under state law, there was a difference between promise and performance. Plaintiffs are claiming that there is a large difference between

-16-

the amount of airtime SunCom promised its customers, and the amount it actually provided.[20]   In this situation, the Court need not rule on the reasonableness of the charges in order to calculate a compensatory amount for the injury that might have been caused. Plaintiff's claim that Defendant billed her for noncommunication time, an allegedly undisclosed billing practice, is also a claim that there was a difference between promise (to receive a certain quantity of minutes) and performance.

Fedor v. Cingular Wireless Corp. expands on this analysis. 355 F.3d 1069 (7th Cir. 2004).  In Fedor, the plaintiff alleged that Cingular improperly billed minutes used in one month to the billing periods in other months, the result being extra charges incurred. Id. at 1070.   In considering whether the claim was properly dismissed via preemption, the court analyzed whether the complaint actually challenged the rates or market entry.  Id. at 1071.  The plaintiff asserted that Cingular agreed to provide a certain number of minutes of call time each month, and the plaintiff agreed that an exceedance of the allotted minutes would result in an additional charge.  Id. at 1072.  Relying on Southwestern Bell, Wireless Consumers, Bastien and Long Distance (both discussed extensively infra), the court agreed that not all claims related to the billing amount are preempted, and while a court would need to refer to the rates charged to determine damages, it would not need to assess the reasonableness of those rates.  Id. at 1071–1074.    "In other

---

[20] Rec. Doc. No. 406, p. 6.

words, these claims address not the rates themselves, but the conduct of Cingular in failing to adhere to those rates." *Id.* at 1074. Since this case did not involve an examination of the reasonableness of the rates, or have an impact on market entry, the breach of contract claim was deemed preserved for the states and was not preempted.

Just like in *Fedor*, this case presents a situation where the Defendant has allegedly failed to provide a certain amount of call time. While resolution of the claim will inevitably concern the amounts charged, the court will only need concern itself with those amounts in order to determine damages to the extent that the Defendant has failed to adhere to the rate. This analysis does not involve a reasonableness examination, nor will it directly affect the rates charged or market entry. Therefore, the claim is not preempted.

All of the cases that Defendant cites in support of its argument for preemption can be distinguished. Defendant first claims that "Section 332 forecloses any attack on the methods employed by wireless carriers to calculate their rates, including practices such as "rounding up" or "send to end" billing or billing for "noncommunication time."[21] In support, Defendant correctly cites *Southwestern Bell* for the proposition that states do not have the authority to prohibit wireless providers from charging in whole minute increments. However, that is not the situation presented by

---

[21] Rec. Doc. No. 372-2, p. 22.

this case.  Plaintiff is not attempting to prohibit the Defendant from engaging in "rounding up" altogether, rather, she is challenging the lack or sufficiency of disclosure of the rounding up.  *Southwestern Bell* goes on to state:  "We do not agree, however, that state contract or consumer fraud laws relating to the disclosure of rates and rate practices have generally been preempted with respect to CMRS."  *Id.* at 19908 ¶23.

Next, Defendant refers to *Brodie v. Telecorp Communications Inc.*[22]  In that case, a Louisiana Court of Appeal found that the plaintiffs' breach of contract claim for alleged erroneous billing of roaming and long distance charges for calls made within the local coverage area as described in the contract was a challenge to SunCom's manner in which it charged customers for its services, and thus was preempted by federal law.  *Id.* at 647-48.  Similarly, Plaintiff in this case is not claiming that the Defendant erroneously billed her for services, but that she did not get what she paid for.  Plaintiff does not argue that there were incorrect charges on her bill.  Plaintiff alleges she did not get the amount of minutes that Defendant promised her for the price she paid.

Defendant's faulty analysis continues with *Ball et al. v. GTE Mobilnet of Cal. et al.*, 81 Cal. App. 4th 529 (2000).  Again, there is no disagreement with Defendants that this case states (in dictum) that "the length of time for which a customer is charged is

---

[22] 836 So.2d 646 (La. App. 5 Cir. 2002), a case involving the same Defendant as the instant action, as well as some of the same learned  defense counsel.

an inseparable component of the rate." *Id*. at 538.  However, Defendant seems to ignore the *Ball* court's analysis of the facts of the case.   In *Ball*, the plaintiffs alleged that charging for noncommunication time is an unfair and unlawful business practice that defendants inadequately disclosed, and sought a permanent injunction to prevent the providers from charging for the noncommunication time. This was not a breach of contract claim. The court concluded that the plaintiffs' claim of inadequate disclosure of these practices was not preempted because such disclosure is a "term and condition" over which a state can exercise its laws. *Id*. at 803-804.  However, the court also found that the plaintiffs' claim that paying for noncommunication time was an unfair business practice (grounded in state law on unfair and unlawful business practices) directly challenged the reasonableness of the methods by which the defendant calculated the rates.  *Id*. at 537.

The plaintiffs' challenges in *Ball* differ from Plaintiff's claims here.  Plaintiff is directly challenging the terms of her contract, whether oral or not.  She is not suggesting that charging for noncommunication time is an unfair business practice in general, rather, she argues that it was unfair for SunCom not to tell her about the practice, misleading her to believe that she would get a certain amount of minutes.  This claim is more akin to a claim for inadequate disclosure than it is to a claim that the practice of rounding up itself is unfair.  Hence, both claims for

inadequate disclosure and breach of contract have been reserved, as we find now, as falling within the jurisdiction of the courts.

The FCC has specifically recognized, and as Defendant correctly points out, "state law claims may, in specific cases, be preempted by Section 332" (*Wireless Consumers, supra* at 17021 ¶ 28). However, when the FCC made this statement, it was interpreting *Bastien v. AT&T Wireless Serv., Inc.*, 205 F.3d 983 (7th Cir. 2000), a case which is detrimental to Defendant's claim.

*Bastien* involved a claim for breach of contract where the plaintiff alleged that the defendant-cellular provider signed up customers without first building the infrastructure necessary to provide reliable cellular connections, knowing that it would be unable to do so. *Id.* at 985. Plaintiff's complaint was that AT&T provided insufficient coverage, resulting in many dropped calls. *Id.* The court concluded that this claim addressed the quality of the service, stating that "a complaint that service quality is poor is really an attack on the rates charged for the service . . ." *Id.* at 988, citing *AT&T Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 228 (1998). Importantly, the court distinguishes its case from another decision, *In re Long Distance Telecommunications Litig.*, 831 F.2d 627 (6th Cir. 1987) ("*Long Distance*"), which is more akin to the case at bar. In *Long Distance*, plaintiffs made claims that long distance providers failed to disclose to customers their practice of charging for uncompleted calls. The *Bastien*

-21-

court interpreted the holding of *Long Distance* to be that "[b]ecause the claims for fraud and deceit would not have affected the federal regulation of the carriers at all, . . . Congress could not have intended to preempt the claims." *Bastien*, 205 F.3d at 989. The *Bastien* court went on: "[I]n sharp contrast to the *Long Distance Litigation*, Bastien's complaint would directly alter the federal regulation of tower construction, location and coverage, quality of service and hence rates for service." *Id.* In addition to being a direct attack on the rates charged, the court found that *Bastien* challenged the modes under which the provider may begin offering services in that market, i.e. market entry, an area expressly preempted by the FCC.

The court in *Bastien* declined to address the intent of Congress, instead, "We merely need to look at the face of the complaint and ask what the nature of the claims are and what the effect of granting the relief requested would be." *Id.* Using the *Bastien* analysis, it is clear that Plaintiff's claim is one arising from a breach of contract. The basis of relief in this case would be monetary damages awarded for breach of contract, which has specifically been distinguished as not directly affecting "rates or rate practices." *Wireless Consumers, supra* at 17034 ¶ 23-28. The imposition of a damage award may indeed have an effect on the rates charged by a carrier, but that effect is merely incidental. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 300 (1976). Many courts

deciding this issue have agreed that an award of monetary damages is not equivalent to regulating rates. *Wireless Consumers, supra* at 17034 ¶ 28 n.28.

Like *Bastien*, the remainder of the cases which Defendant cites in support of its argument that state law claims may sometimes be preempted are also not persuasive because of materially significant factual differences with this case. *See Gilmore v. Southwestern Bell*, 156 F.Supp.2d 916 (N.D. Ill. 2001) (claim against cellular provider alleging, *inter alia*, that an administrative fee charged by the provider and absent from the contract terms was a breach of contract because the plaintiff never agreed in writing to pay such a fee was in actuality a challenge to the appropriateness of the fee and fell within the realm of determining the reasonableness of the charges); *Naevus Int'l, Inc. v. AT&T Corp.*, 713 N.Y.S.2d 642 (Sup. Ct. 2000), modified, 724 N.Y.S.2d 721 (App. Div. 2001) (breach of contract claim for frequent dropped calls, inability to make or receive calls, and failure to obtain credit for calls that were involuntarily disconnected was about the quality of the service provided, and therefore a challenge to the rates charged and not a breach of contract claim); *Chiarella v. Sprint Spectrum LP, et al.*, 921 So.2d 106 (La. App. 4 Cir. 2005) (complaint of technical difficulties with service such as dropped calls were related to the market entry of provider and hence preempted).

Even if this court were to determine that Plaintiff's claims were not a clear-cut breach of contract issue, in situations where

-23-

it is unclear whether or not from the face of the pleadings that Plaintiff is challenging the reasonableness of the rates, the court should err, for now, against preemption. *Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.*, 958 F.Supp. 947, 956 (D.Del. 199) ("[B]ecause it is unclear from the face of the complaint whether these claims challenge the reasonableness or fairness of the practice of charging for the non-communication time, this Court must conclude that they do not.")

Defendant also argues that if this case is really about enforcement of a contractual term, then Plaintiff's claim should be dismissed because SunCom disclosed and honored all contractual terms.[23] Defendant claims that two brochures ("Terms and Conditions of Service" and "Service Plans and Coverage Areas")[24] make it clear that SunCom participates in rounding up and send to end billing.[25] While it is true that these documents do state that the Defendant practices rounding up and send to end billing,[26] the issue is whether these documents are a part of the contract that Fontenot entered into with the Defendant.  These documents appear to be supplemental materials, which Plaintiff alleges were never given to her at all.[27]  This claim refers to an oral contract made between the Plaintiff and SunCom, and the parties disagree as to what, if any, specific documentation was given to Fontenot at the time she

---

[23] Rec. Doc. No. 413-2, p.4.
[24] Rec. Doc. No. 412-2.
[25] *Id.* at p. 3-4.
[26] Rec. Doc. No. 412-2, p.6.
[27] Rec. Doc. No. 372-5, p.16; Rec. Doc. No. 123, p.5.

entered into the contract.[28]  This conflicting evidence as to whether there was any written contract, whether the contract incorporated the brochures, and so on relies on the intent of the parties and represents a material issue for the trier of fact. Therefore, dismissal on this issue is not appropriate.

In sum, there is sufficient authority to conclude that the state law claims brought by Plaintiff and the damages sought do not implicate rate regulation prohibited by § 332.

### C.   Filed Tariff Doctrine

Next to be considered is SunCom's alternative argument that upon a finding that that Plaintiff's claims were not federally preempted because they were not a challenge to the entry of rates or rate practices, then Plaintiff's claims must be a charge to "other terms and conditions"  and thus prohibited by the filed tariff doctrine.  Although the doctrine (also interchangeably named the filed rate doctrine) has never been applied to wireless carriers, SunCom contends that the filed tariff doctrine prohibits litigation of claims that fall under the second half of § 332(c)(3)(A) governing "other terms and conditions."  As previously stated, that section reads: "[T]his paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services."  47 U.S.C. § 332 (c)(3)(A).  SunCom maintains that the Louisiana Public Service Commission ("LPSC")

---

[28] Rec. Doc. No. 319, p.19-20; Rec. Doc. No. 412-2, p.2.

retains jurisdiction over billing practices that are not preempted by the FCA, and the filed tariff doctrine should be applied to the state regulations regarding wireless carriers.  However, SunCom's argument is without merit, simply because this case does not implicate the "filed rate" doctrine.

**1.   Background**

Following the 1993 amendments of the Federal Communications Act and § 332, the LPSC, on behalf of the state, petitioned the FCC to retain state regulatory authority over the rates for CMRS providers.   *In re Petition on Behalf of the Louisiana Public Service Commission for Authority to Retain Existing Jurisdiction over Commercial Mobile Radio Services Offered Within the State of Louisiana*, 10 F.C.C.R. 7898 (May 19, 1995).  The FCC denied the petition to regulate rates ("[the Petition] fails to satisfy the statutory standard Congress established for extending state regulatory authority over CMRS rates", *Id.,* ¶ 1), but recognized that the State retains regulatory authority over "carrier practices, separate and apart from their rates." *Id.* at 7098 ¶ 46. The FCC then permitted the LPSC "to continue to conduct proceedings on complaints concerning such matters" including "customer billing information and practices and billing disputes and other consumer matters." *Id.*   The FCC also concluded that the State was not prohibited from requiring carriers to make informational filings, i.e. identifying themselves to the LPSC, in respect of "a state's

traditional authority to monitor commercial activities within its borders." *Id.* at ¶ 47.

Subsequently in 1996, the LPSC promulgated its "Local Competition Regulations" which set forth the regulatory requirements for wireless carriers. *See In re Regulations for Competition in the Local Telecommunications Market*, 1996 WL 137695 (La. P.S.C. March 15, 1996). These regulations require wireless carriers to file tariffs which "identify and describe the rates, terms and conditions of services offered and provided in Louisiana." *Id.* at § 401(b).

### 2.   The Filed Rate Doctrine – Generally

The Federal Communications Act requires telecommunication common carriers to file tariff schedules with the FCC. 47 U.S.C. § 203(a). A tariff schedule lists the terms and conditions under which service providers will offer telecommunication services to their customers. *Int'l Tel. Ctr., Inc. v. Am. Tel & Tel. Co.,* 1997 WL 599618, 3 (E.D.La. 1997). Once tariffs are filed and published by the FCC, a carrier is prohibited from charging or receiving an amount greater or less than the filed rate. 47 U.S.C. § 203(c); *see Carter v. AT & T,* 365 F.2d 486, 494 (5th Cir. 1966). The tariffs govern the legal relationship between the provider and its customers and trigger the application of the filed rate doctrine to telecommunication service agreements. *Int'l Tel. Ctr.,* 1997 WL 599618 at 3.

The filed rate doctrine holds that a rate approved by a governing regulatory agency is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.*, citing *Wegoland Ltd. v. Nynex Corp.,* 27 F.3d 17, 18 (2d Cir.1994. The legal rights of parties contracting for regulated services are governed by tariffs published with the appropriate regulatory agency. Unless and until the published tariff rate is suspended or set aside, it is, for all purposes, the legal rate. *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 416, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *see also* Carter, 365 F.2d at 496 ("[A] tariff, required by law to be filed, is not a mere contract. It is the law."); *Illinois Cent. Gulf R.R. Co. v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir.1978) ("[F]iled tariffs have the force of law...."). "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Square D. Co.,* 476 U.S. at 416-7 (citations omitted); *see also Carter,* 365 F.2d at 494 ("A telephone company may not ... deviate from the rates, classifications, regulations or practices contained in the tariffs.")

In *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the Supreme Court offered two reasons for the strict application of the filed rate doctrine. The Court explained that if the judiciary were allowed to reassess rates, it would become intertwined in determining the

reasonableness of those rates, essentially undermining the regulatory structure Congress intended. *Keogh,* 260 U.S. at 163; *see Wegoland Ltd.,* 27 F.3d at 18. The Court also explained that by granting relief, the judiciary would facilitate the discrimination in rates between customers-a result Congress wanted to prevent through regulation. *Keogh,* 260 U.S. at 162; *see also Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (explaining that by allowing attacks against the applicability of filed rates, courts would undermine rate uniformity); *Illinois Cent. Gulf R.R. Co.,* 586 F.2d 592 ("If a carrier could modify its tariffs without filing a new tariff, it could engage in rate discrimination.").

Under the filed rate doctrine, a rate duly published is presumed known to all and neither provider nor consumer may depart from it. *Int'l Tel. Ctr.*, 1997 WL 599618 at 3.  "This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress...." *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 835 (1915).

### 3.   Application of Filed Rate Doctrine to Wireless Carriers

The FCC has specifically held that the filed rate doctrine does not apply to CMRS providers.  *Wireless Consumers*, 15 F.C.C.R. at 17029, ¶ 15-22.  Section 332 of the FCA which governs "mobile services" construes cellular telephone service providers as common

carriers, and thus companies providing cellular services are subject to many of the same regulations as long distance telephone service providers. 47 U.S.C. § 332(c)(1)(A). For example, cellular telephone service providers must furnish service to all customers upon reasonable request and may not charge rates or engage in practices that are unjust or unreasonable. 47 U.S.C. §§ 201, 202. However, cellular telephone service providers (CMRS) providers, are specifically exempted from complying with Section 203 (section requiring tariff filing). 47 C.F.R. § 20.15(a), (c) (1997). In an FCC order implementing various provisions of the FCA's 1993 amendments, the FCC concluded that sufficient competition in the cellular marketplace obviates any need for conventional regulation and decided to "forbear from imposing any tariff filing obligations upon CMRS providers." Second Report and Order, *In the Matter of Implementing of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Services,* 9 FCC Rec. 1411, 1418 and 1478 (1994).

The FCC has not only exempted the filing of tariffs by wireless providers with the FCC, it has prohibited the act; in other words, the wireless industry has been "detariffed." *Wireless Consumers*, 15 F.C.C.R. at 17031. It did so in part because the deregulated, competitive nature of the wireless market, governed by service contracts. *Id.* at 17030 ¶ 17, 17031 ¶ 20, 21. The FCC has also expressly ruled that the filed rated doctrine in no way precludes a state court's ability to award monetary relief against

wireless telephone companies.   *Id.* at 17031.   Consumers in a detariffed, competitive marketplace are "able to take advantage of remedies provided by state consumer protection laws and contract laws against abusive practices." *Id.*, 17033-34 ¶ 22.

Importantly, the FCC also stated: "Rather than file tariffs to establish the legally effective rates (and *other terms and conditions*) for their offering, CMRS carriers enter into service contracts with their customers." Id. at 17033 ¶ 21.  (emphasis added). In other words, the FCC has determined that tariffs do not have the force of law when it comes to "other terms and conditions," at least in the federal arena.

Defendant argues that if in fact services and billing are involved (and not rates), the filed rate doctrine should apply. Defendant reasons that under the filed tariff doctrine, a consumer is presumed to have notice of billing practices stated in the tariff.   SunCom has filed a tariff detailing its billing practice with LPSC, therefore, consumers are barred from challenging those practices in a court of law.

While it has been held that the fact that services and billing are involved instead of rates or rate setting does not make the filed rate doctrine inapplicable, *American Tel. & Tel. Co. v. Central Office Tel., Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), the instant case is distinguishable. *American Tel. & Tel. Co.,* along with every other case the Defendant has cited, involved a landline telephone company required to file

tariffs.   In this case, SunCom is characterized as a commercial mobile radio service (CMRS) provider, and is specifically exempted from tariff filing requirements by the FCC.   Because there is no tariff filing requirement, not only are there no tariffs on file, but the two purposes behind the "filed rate" doctrine –preserving an agency's primary jurisdiction to determine the reasonableness of rates and insuring that only those rates approved are charged– do not apply in this case.  "Where an entity is not regulated because it is not required to file its rates with the FCC for approval by that agency, there appears to be little justification for the doctrine."  *Gallivan v. AT&T et al.*, 124 Cal.App.4th 1377 (2005) The authorities relied upon by Defendant are thus not applicable.

Defendant fails to provide evidence that the LPSC requires tariff filings for any purpose other than an informational one, let alone any indication that the State has intended for the filed rate doctrine to apply in this case.   An examination of the Local Competition Rules reveals no suggestion that the required tariff filing has the force and effect of law to the extent that it is enforceable in a court against a breach of contract action.

Furthermore, the structure of the statute indicates that, like rates, the required filing of "other terms and conditions" are merely informational.  Since the State does not have the authority to regulate rates, the tariffs as they apply to rates must be deemed informational.  The statute makes no distinction between tariffs filed for rates, and tariffs filed for terms and

conditions.

The fact that Defendant has not provided convincing proof, along with full consideration of available resources on the matter, leads to the conclusion that the LPSC's tariff requirement should not be given deference with regards to the filed rate doctrine, which has not been applied to wireless providers, and only been applied in the context of the Federal Communications Act.   To extend the doctrine beyond these realms is not within the jurisdiction of this court; if the state wishes to require enforcement of filed tariffs concerning other terms and conditions, it may do so through the legislative process and within the administrative regulations of the pertinent federal executive agencies.

Accordingly, the renewed motions for partial summary judgment and dismissal are **DENIED**.[29]

New Orleans, Louisiana, this 2nd day of November, 2009.

UNITED STATES DISTRICT JUDGE

---

[29] To the extent movant also sought to strike Plaintiffs' experts here, Record Document No. 413-2 (p. 4), the Court rejects that effort here.