**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**Lafayette-Opelousas Division**

| | | |
|---|---|---|
| **IBERIA CREDIT BUREAU, INC. d/b/a** | * | |
| **INFORMATION SERVICES, WARDELL X.** | * | |
| **GERHARDT, AL THERIOT CONSTRUCTION,** | * | |
| **INC. ET AL.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO.  CV01-2148** |
| | * | |
| **CINGULAR WIRELESS, L.L.C., formerly** | * | **JUDGE LEMELLE** |
| **known as BELL SOUTH MOBILITY, ET AL.** | * | |
| | * | **MAG. JUDGE HANNA** |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**TELECORP'S POST-HEARING BRIEF**
**IN OPPOSITION TO CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      THE POSTURE OF PLAINTIFFS' CLAIM ................................................................. 1

II.     FURTHER ANALYSIS OF COMMONALITY, PREDOMINANCE AND
        TYPICALITY DEMONSTRATES THAT CLASS CERTIFICATION IS
        UNWARRANTED ................................................................................................ 6

        A.      The Court Must Conduct a Rigorous Analysis of Commonality and
                Predominance and Cannot Assume the Pleadings Are True .................................. 6

        B.      Individual Issues Regarding Contract Formation and Consent Will
                Predominate ..................................................................................................... 9

                1.      Every Named Plaintiff's Experience Differed, Making
                        Subclasses Impossible.............................................................................. 10

                2.      Plaintiffs' Cursory Evidence Is Insufficient to Meet Their
                        Burden...................................................................................................... 14

                3.      Individual Issues Regarding the Meaning of Contract
                        Terms Would Predominate at Trial........................................................... 15

                4.      Individual Issues Will Predominate When Trying
                        Telecorp's Defenses................................................................................. 17

        C.      The Named Plaintiffs Are Not Typical of the Putative Class............................... 19

III.    CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

## Federal Cases

*Alicke v. MCI Commc'ns Corp.*,
  111 F.3d 909 (D.C. Cir. 1997) ...................................................................... 14

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................. 6

*Basco v. Wal-Mart Stores, Inc.*,
  216 F. Supp. 2d 592 (E.D. La. 2002) ............................................................ 19

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) .............................................................. 7, 14, 17

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010), *cert. granted*, 79 U.S.L.W. 3342, 2010 WL
  3358931 (U.S. Dec. 6, 2010) ................................................................... 7, 8

*Gawry v. Countrywide Home Loans, Inc.*,
  640 F. Supp. 2d 942 (N.D. Ohio 2009) ......................................................... 12

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .............................................................................. 8, 14

*Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*,
  379 F.3d 159 (5th Cir. 2004) ...................................................................... 9

*In re Katrina Canal Breaches Consol. Litig.*,
  258 F.R.D. 128 (E.D. La. 2009) .................................................................. 7

*Marcus v. AT&T Corp.*,
  938 F. Supp. 1158 (S.D.N.Y. 1996) ............................................................. 14

*O'Quin v. Verizon Wireless*,
  256 F. Supp. 2d 512 (M.D. La. 2003) ............................................................ 9

*Steering Committee v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ...................................................................... 7

## State Cases

*Action Fin. Corp. v. Nichols*,
  180 So. 2d 83 (La. App. 2 Cir. 1965) ............................................................ 3

*Aguillard v. Auction Mgmt. Corp.*,
  2004-2804 (La. 6/29/05), 908 So. 2d 1 ..................................................... 7, 10

*Bank of Coushatta v. Patrick*,
  503 So. 2d 1061 (La. App. 2 Cir. 1987) ......................................................... 5

*Bogalusa Cmty.  Med. Ctr. v. Batiste*,
  603 So. 2d 183 (La. App. 1 Cir. 1992) ........................................................... 5

*Campbell v. Melton*,
   2001-2578 (La. 5/14/02), 817 So. 2d 69 ................................................................ 16

*City of Shreveport v. SGB Architects, L.L.P.*,
   45,458 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1105 .................................................. 5

*Dixie Campers, Inc. v. Vesely Co.*,
   398 So. 2d 1087 (La. 1981) ..................................................................................... 16

*Green v. Culpepper*,
   26,393 (La. App. 2 Cir. 3/1/95), 652 So. 2d 138 .................................................... 5

*Hymel v. Eagle, Inc.*,
   08-1287 (La. App. 4 Cir. 3/18/09), 7 So. 3d 1249 ................................................. 5

*Long v. Charles Kaufman Co.*,
   122 La. 281, 47 So. 606 (1908) ............................................................................... 17

*Mann v. GTE Mobilnet of Birmingham Inc.*,
   730 So. 2d 150 (Ala. 1999) .............................................................................. 13, 17

*Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to
   Cover Note 95-3317(A)*,
   2001-2219 (La. App. 1 Cir. 11/20/02), 837 So. 2d 11 ........................................... 4

*Mobley v. AT&T Corp.*,
   717 So. 2d 367 (Ala. 1998) ..................................................................................... 14

*Porr v. NYNEX Corp.*,
   660 N.Y.S.2d 440 (App. Div. 1997) ........................................................................ 14

*Weinberg v. Sprint Corp.*,
   173 N.J. 233, 801 A.2d 281 (2002) ........................................................................ 14

*Whitehall Oil Co. v. Boagni*,
   255 La. 67, 229 So. 2d 702 (1969) ......................................................................... 18

## Statutes

La. Civ. Code Ann. art. 1848 ........................................................................................ 16

La. Civ. Code Ann. art. 1927 ........................................................................................ 10

La. Civ. Code Ann. art. 2315 ........................................................................................ 17

La. Rev. Stat. Ann. § 51:1963 ....................................................................................... 9

## Administrative Rulings

*In re Petition for Declaratory Ruling on Issues Contained in Count I of White v.
   GTE Class Action Complaint*,
   16 F.C.C.R. 11558, ¶ 19 (2001) ........................................................................ 2, 14

**Additional Authorities**

Jeffrey M. Hirsch, Assoc. Prof. of Law, University of Tennessee College of Law,
    "Supreme Court Grants Cert. on Dukes v. Wal-Mart,"
    accessed on January 12, 2011 at
    http://lawprofessors.typepad.com/laborprof_blog/2010/12/supreme-court-
    grants-cert-on-dukes-v-wal-mart.html ...................................................................................... 9

Telecorp Communications, Inc. d/b/a SunCom ("Telecorp") submits this post-hearing brief in response to the Court's request for additional briefing on commonality, predominance and typicality.  Rec. Doc. No. 612 at 3.[1]

## I.     THE POSTURE OF PLAINTIFFS' CLAIM

Plaintiffs' complaint is that Telecorp rounded up.  Telecorp concedes it rounded up.  The question for each named plaintiff and purported class member is whether their particular contract included a contractual promise to instead bill second-by-second; the primary question before the Court is whether these claims can be resolved on a class-wide basis.

Telecorp's Terms and Conditions, which were included in brochure form in the phone box received by all customers and provided and referenced in several other ways,[2] disclosed and promised to all customers that minutes of use would be rounded up.  Summary judgment based on these disclosures and Telecorp's contract materials has been denied, Rec. Doc. No. 612, presumably based on the Court's belief that there may be fact questions as to whether and/or which of the named plaintiffs saw or should have seen such disclosures.[3]  The denial of summary judgment leaves open the question of what legal theory Plaintiffs are truly employing to challenge rounding up.

In theory, rounding up might be actionable if it were inherently unfair (regardless of any disclosures or contract terms).  However, as a matter of law Plaintiffs are barred from

---

[1] The Court clarified at oral argument that its call for further briefing on *commonality* also encompassed the *predominance* element.

[2] For example, the terms and conditions were printed on the reverse side of a legal-size form contract received by some customers at the point of sale; they were referenced in the Welcome Guide provided to customers at the point of sale; they were referenced in rate plan materials that were provided to customers at the point of sale (which were in turn incorporated by reference in the terms and conditions); they were referenced in subscriber invoices; and they were available on Telecorp's website.  Rec. Doc. No. 542-2 at 13-15; Rec. Doc. No. 600-2 at 13-20.

[3] As explained in more detail below, the circumstances of each plaintiff's activation, upgrade, or addition of phone lines varied markedly.

challenging the reasonableness of the practice, and the Court (and Plaintiffs themselves) have acknowledged that state law challenges to the reasonableness of rounding up are preempted by federal law and should be addressed, if at all, by the FCC.  Rec. Doc. No. 431 (11/2/09 Order).[4] The FCC has approved of rounding up, rejecting a consumer's argument that rounding up was unreasonable or unfair, emphasizing this method of billing in whole minute increments is "the most common billing practice."  *In re Petition for Declaratory Ruling on Issues Contained in Count I of White v. GTE Class Action Complaint*, 16 F.C.C.R. 11558, ¶ 19 (2001).  Thus, any argument by Plaintiffs that rounding up is unfair is barred by the Court's summary judgment ruling, the FCC's pronouncements, and the estoppel effect of their own prior statements.

Therefore, rounding up can be actionable only if Telecorp (1) breached a contractual obligation not to round up (for example, by promising to bill by the second), or (2) committed a deceptive trade practice by failing to abide by some independent obligation to more prominently disclose the billing practice of rounding up.

Plaintiffs' initial breach of contract claim (when Claudia Fontenot was the only named plaintiff) alleged that Telecorp made oral contracts.  Plaintiffs abandoned that theory once Ms. Fontenot's claims survived summary judgment and Plaintiffs were faced with the prospect of trying to certify a class of customers with oral contracts.  Now, as part of their bid to have a class certified, Plaintiffs argue that Telecorp breached a written promise to bill by the second.  This requires finding a written promise that minutes would not be rounded up.  No such contract term exists.  (As discussed more fully below, declarations from the class representatives that they "understood" calls would be measured in seconds are irrelevant to an inquiry into what the contract actually promises.)

---

[4] Though plaintiffs alleged a claim for unfair trade practices (i.e., a consumer protection violation) under the Louisiana Unfair Trade Practices Act ("LUTPA"), claims under that statute cannot be certified as class actions.  Plaintiffs' individual LUTPA claims remain in the lawsuit.

Plaintiffs vainly attempt to infer such a promise from handwritten shorthand on the front of two different documents.  One is a single sheet, front-and-back, long-form contract which was intermittently used by Telecorp (in the one example provided to the Court, the handwritten notation "Cities 100" constitutes the alleged promise not to round up).  The other document is in no sense a "contract," but in any event contains nothing other than a handwritten notation, "Loc. 300," referencing a rate plan.  Plaintiffs' argument requires an assumption that different handwritten notations on each customer's contract (*e.g.*, the ambiguous reference to the "Cities 100" rate plan) constitute promises to bill airtime in one-second increments rather than in full minute increments.  This assumption is contradicted not only by the contract terms themselves but also by the rate plan brochures, which describe the referenced rate plans.  Such brochures clearly describe the practice of rounding up, are expressly incorporated on the <u>front-side</u> of the form contract received by some (but not all) customers, and are acknowledged by each customer who signed the form contract in clear language above the signature line.[5]  They are necessarily part of the contract as they are the only place where the number of minutes and other features provided in each plan are explained.  The handwritten scrawl "Cities 100" or "Loc. 300" does <u>not</u> explain, without looking at the relevant rate plan brochure, which cities were included in the coverage area, how many minutes a customer got for free on nights and weekends, under what terms a customer would receive 1,000 free minutes of incoming calls, when a customer was free of long distance charges, that Caller ID, Call Waiting and Voicemail were included for free, or under what conditions calls to other SunCom customers would or would not count against a customer's minutes.  *See, e.g.,* Rec. Doc. No. 546-6 (Service Plans and Coverage Areas

---

[5] "As it has been uniformly held" in Louisiana, language incorporated by reference into a contract from another document "become[s] a part of the agreement between the parties with the same force and effect as if the provisions had been contained in the basic contract . . . ."  *Action Fin. Corp. v. Nichols*, 180 So. 2d 81, 83 (La. App. 2 Cir. 1965).

brochure), 546-10 (brochure for add-on services).  The relevant rate plan brochure necessarily was part of each contract.

These infirmities in the breach of contract claim may explain why Plaintiffs seemed to take yet another approach in their supplemental brief in support of class certification, focusing on the alleged inadequacy of some of the rounding up disclosures, and the alleged "understanding" of a few of the named plaintiffs (evidenced via cookie-cutter declarations) that they would be billed by the second rather than the minute.

This legal theory, of alleged inadequate disclosure and an "understanding" about billing practices, could theoretically state a claim of unfair trade practices under the LUTPA.  (Indeed, Plaintiffs' Complaint alleges a violation of the LUTPA.)  But Louisiana law permits LUTPA claims to proceed only on an individual basis.  Plaintiffs are thus attempting to shoehorn a LUTPA claim into a breach of contract framework.  To allow this would be to wholly frustrate Louisiana policy.

Moreover, in a claim for breach of contract it is irrelevant if some of the named plaintiffs did not read the contracts or Terms and Conditions, because in Louisiana "[a] party to a contract cannot avoid its obligations by contending that he did not read it or he did not fully understand it."  *Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 2001-2219 (La. App. 1 Cir. 11/20/02), 837 So. 2d 11, 24-25  (enforcing contract despite one party's argument that it had not read the other party's substantive changes before assenting:  the "doctrine of unilateral error cannot save a party from the consequences of an otherwise valid contract when that error is the result of simple negligence").  Courts have also enforced the terms on the reverse side of a contract, holding that a party did not have to indicate it read both sides of the document in order to be bound.  *City of Shreveport v. SGB Architects,*

*L.L.P.*,  45,458 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1105, 1108 ("a person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand its terms").[6]

Plaintiffs have shifted their argument yet again in their Motion for Reconsideration of the Court's Order compelling arbitration, filed two days before the deadline for post-hearing briefs. Rec. Doc. No. 626-1 at 2.  In this new motion, Plaintiffs argue that Telecorp had a right to arbitrate with Claudia Fontenot after she upgraded her rate plan and then allegedly "received a new contract with the new arbitration agreement" during her service, but that Telecorp waived this right by failing to assert it.  The evidence Plaintiffs submit is a computer notation made by a customer service representative indicating that Ms. Fontenot changed from one rate plan to another (but not specifically showing she received the Terms and Conditions).  Rec. Doc. No. 626-1, Ex. 5 at 13.  Putting aside the problems with the Motion for Reconsideration, it is remarkable that Plaintiffs are now insisting, after nine years of firm denials that Ms. Fontenot received <u>anything</u> in writing from Telecorp describing her contract terms, that Ms. Fontenot not only <u>did</u> receive the Terms and Conditions, but that she was also bound by the arbitration clause contained in the Terms and Conditions.  This about-face is a significant admission by Plaintiffs that Telecorp's method of contracting and its method of distributing binding Terms and Conditions to its customers were valid, and would bind every class member to the contract terms, <u>including</u> the disclosures regarding rounding up.

---

[6] *See also Bogalusa Cmty.  Med. Ctr. v. Batiste*, 603 So. 2d 183, 186 (La. App. 1 Cir. 1992) (rejecting argument that contract did not obligate party because she did not understand its terms); *Green v. Culpepper*, 26,393 (La. App. 2 Cir. 3/1/95), 652 So. 2d 138, 142  (affirming enforceability of contract because a "burdensome obligation in a contract may not be avoided simply because the obligor did not understand the amount or extent of his obligation") (citing *Bank of Coushatta v. Patrick*, 503 So. 2d 1061 (La. App. 2 Cir. 1987)); *Hymel v. Eagle, Inc.*,  08-1287 (La. App. 4 Cir. 3/18/09), 7 So. 3d 1249, 1257-58.

These maneuvers demonstrate that Plaintiffs are out of options and are left with a claim that cannot be certified as a class.  There is no dispute that the Terms and Conditions packed in all phone boxes promised Telecorp would round up.  There is no dispute that the two-sided contract received by some customers promised Telecorp would round up.  There is no dispute that rate plans promised Telecorp would round up.  There is no dispute that there is <u>no</u> written promise in any of the documents to bill by the second.  Therefore the question for resolution by the fact-finder at trial would be whether other, currently unspecified, promises were somehow made (whether orally, via some ambiguity in the documents, or by some other unknown document) that would override the written contract terms promising rounding up and instead contractually obligate Telecorp to bill in one-second increments.  The question before the Court now, at the class certification stage, is whether the Court can try these issues (among others) solely on the evidence of the named plaintiffs' experiences.  In other words, were the contractual formation experiences of the named plaintiffs common to the class, were those experiences typical of absent class members, or would individual issues of the named plaintiffs <u>and</u> absent class members predominate at trial.  The answers to these questions demonstrate the futility of class certification.  Plaintiffs may be entitled to pursue individual breach of contract (or LUTPA) claims, but they cannot pursue those claims as a class.

## II.     FURTHER ANALYSIS OF COMMONALITY, PREDOMINANCE AND TYPICALITY DEMONSTRATES THAT CLASS CERTIFICATION IS UNWARRANTED

### A.      The Court Must Conduct a Rigorous Analysis of Commonality and Predominance and Cannot Assume the Pleadings Are True

The commonality requirement of Rule 23(a) and the predominance requirement of Rule 23(b)(3) are intertwined and "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The

predominance inquiry, although similar to commonality, is "far more demanding." *Id.* at 623-24. The requirements of 23(b) pose more rigorous tests than 23(a) and require a realistic analysis of "how the plaintiffs' . . . claims would be tried, individually or on a class basis." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

Here, the terms and content of the contract are in dispute. Moreover, whether a plaintiff consented to certain terms — a critical part of the *Aguillard*[7] inquiry into the validity of contracts of adhesion — is also in dispute and depends on each individual subscriber's factual circumstances. Thus, the Court must analyze how such issues would be tried. "Whether common issues predominate and whether the class action is a superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 132 (E.D. La. 2009) (quoting *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006)). "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano*, 84 F.3d at 744; *accord Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 594, 598-99 (9th Cir. 2010) (holding that a court "must conduct a *rigorous analysis* to determine if the prerequisites of Rule 23 have been *met*" and must look "well beyond the pleadings" and not assume the plaintiffs' substantive allegations are true) (emphasis in original), *cert. granted*, 79 U.S.L.W. 3342, 2010 WL 3358931 (U.S. Dec. 6, 2010). Thus, it is not enough for Plaintiffs to argue that "rounding up" or "consent" are common issues.[8] Rather, Plaintiffs bear the burden of demonstrating, via a rigorous analysis, that

---

[7] *Aguillard v. Auction Mgmt. Corp.,* 2004-2804 (La. 6/29/05), 908 So. 2d 1.
[8] The fact that Telecorp's practice of rounding up is admittedly common to all of its customers does not resolve whether common issues predominate over individual issues for purposes of class certification. The question is not whether Telecorp engaged in the practice; instead, the question is whether there is a

common issues predominate over the myriad individual issues of fact and law surrounding each Plaintiff's claim.

The Ninth Circuit's decision in *Dukes* does not contradict Fifth Circuit precedent on these questions.  The *Dukes* decision emphasizes that the commonality requirement focuses on common issues, rather than proof, but that the predominance inquiry is where a court must evaluate proof and how issues would "play out" at trial:

> Rule 23(a)(2) is about invoking common *questions, see* [*Gen. Tel. Co. of Sw. v.*] *Falcon,* 457 U.S. [147,] 158 [1982], whereas Rule 23(b)(3) requires a district court to formulate 'some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case,' [*In re*] *New Motor Vehicles* [*Canadian Export Antitrust Litig.*]*,* 522 F.3d [6,] 20 [(1st Cir. 2008)] (internal quotation marks omitted). We thus should not be surprised that a district court will have to make more precise factual determinations under Rule 23(b)(3) than under Rule 23(a)(2).

*Dukes*, 603 F.3d at 593.  Beyond these points, the *Dukes* decision is of limited application in this case because the *Dukes* court was not analyzing the requirements of a Rule 23(b)(3) class action (in which "questions of law or fact common to class members predominate over any questions affecting only individual members"), but rather was reviewing the certification of a class under Rule 23(b)(2) seeking injunctive relief as to the class as a whole.  The certification order in *Dukes* was therefore not subject to the higher predominance standard applicable to Rule 23(b)(3) class actions.  603 F.3d at 615.

The Supreme Court's grant of certiorari in the *Dukes* case, 79 U.S.L.W. 3342, 2010 WL 3358931 (U.S. Dec. 6, 2010), regarding the ability to seek monetary damages in a Rule 23(b)(2) action and "[w]hether the class certification ordered under Rule 23(b)(2) was consistent with Rule 23(a)," is unlikely to signal a sea change in the law regarding Rule 23(b)(3) class actions.

---

contractual agreement to engage in some practice *other than* rounding up (such as billing in second-by-second increments).

Further, the Supreme Court is not reviewing Fifth Circuit law; the only way *Dukes* would impact

this case is if the Supreme Court departs from its own precedent, upon which Fifth Circuit law

and Telecorp's briefing now relies. Although it is difficult to divine how the Supreme Court is

likely to rule based upon its vague order granting certiorari, commentators speculate that the

Supreme Court is likely to reverse the Ninth Circuit's unprecedented grant of class certification

in *Dukes*, which concerns an enormous, nation-wide, and diverse employment discrimination

class.[9] A ruling in *Dukes* is unlikely to offer a lifeline to revive the Plaintiffs' fortunes in this

action.

**B.    Individual Issues Regarding Contract Formation and Consent Will Predominate[10]**

Telecorp contends that all of its customers consented to the Terms and Conditions they

received in their boxes. Under Louisiana law, such shrinkwrap agreements are fully enforceable.

*See, e.g., O'Quin v. Verizon Wireless*, 256 F. Supp. 2d 512, 515-17 (M.D. La. 2003) (enforcing

terms and conditions included in box with cell phone even though terms were available only

after consumers purchased phone). Under the law of this case, shrinkwrap Terms and Conditions

documents are enforceable. *Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*, 379 F.3d 159,

167 (5th Cir. 2004) (noting cellular service provider's terms and conditions provided in the box

with the handset are accepted by activation of the account ).[11] Because Telecorp's contract

---

[9] *See, e.g.,* Jeffrey M. Hirsch, Assoc. Prof. of Law, University of Tennessee College of Law, "Supreme Court Grants Cert. on Dukes v. Wal-Mart," accessed on January 12, 2011 at http://lawprofessors.typepad.com/laborprof_blog/2010/12/supreme-court-grants-cert-on-dukes-v-wal-mart.html.

[10] Telecorp will focus on Plaintiffs' arguments in favor of a Rule 23(b)(3) class action in this brief. Telecorp has already demonstrated that certification under Rule 23(b)(1)(A) (providing for certification of a mandatory limited fund class action) is inappropriate when opposed by the defendant. Rec. Doc. No. 546 at 23-24. Plaintiffs do not seek to certify a class under Rule 23(b)(2). *See* Rec. Doc. No. 521-1 at 18-22.

[11] Further support for the enforceability of shrinkwrap agreements in Louisiana can be found in the software context, where Louisiana is one of only two states to enact a statute specifically addressing the enforceability of shrinkwrap licenses. *See* La. Rev. Stat. Ann. § 51:1963 ("[a]ny person who acquires

documents clearly disclosed rounding up and are analogous to the documents enforced by the Fifth Circuit in *Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*, *see* Rec. Doc. No. 607-1 ¶ 7 & Ex. AA (Sprint terms and conditions), Telecorp moved for summary judgment dismissing Plaintiffs' breach of contract claims.  The Court denied summary judgment, declining to foreclose Plaintiffs' claims under *Aguillard* at this time.  However, *Aguillard* requires (and Plaintiffs encourage) an inquiry into whether the class members consented to the Terms and Conditions, including Telecorp's practice of rounding up.  Under Louisiana law, this inquiry requires evidence about what <u>each</u> customer knew, was told, received, and saw.  La. Civ. Code Ann. art. 1927 (acceptance of a contract's terms may be manifested "orally, in writing, or by action or inaction that under the circumstances [are] clearly indicative of consent"); *Aguillard v. Auction Mgmt. Corp.,* 2004-2804 (La. 6/29/05), 908 So. 2d 1.  This will create a myriad of individual issues.

### 1.    Every Named Plaintiff's Experience Differed, Making Subclasses Impossible

The experiences of the various named Plaintiffs were vastly different and illustrate the overwhelmingly individual factual analysis required to resolve Plaintiffs' breach of contract claim:

- Claudia Fontenot, who served as Plaintiffs' sole named plaintiff for the first eight years of this lawsuit, claimed she received only a phone and receipt from Telecorp.  Her claims are based on an alleged oral contract between the parties.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. N, Fontenot Dep. at 60:12-62:5).

- Charlene Guilbeau purchased her service plan from a kiosk at Sam's Wholesale, and recalls the sales representative filling out the Customer Information Form and Agreement by hand, but has no memory of any other document.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. Q Guilbeau Dep. at 53:14-18).

---

computer software or a copy thereof shall be conclusively deemed to have accepted and agreed to all the terms of the license agreement for such software or copy thereof").

- Donald Ledet does not remember receiving any documents when purchasing his service plan at a SunCom store.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. L, Ledet Dep. at 38:24-39:10, 59:4-60:24).

- Kelly Landry alleges that her contract with Telecorp is a one-sided document containing handwritten personal information, with no specific contract terms beyond a handwritten notation reading "Loc. 300."  Despite Plaintiffs' allegations to the contrary, Ms. Landry is the *only* named plaintiff who recalls receiving this document.  In addition to this form, she also signed a postcard-sized document that referenced the terms of her rate plan, which include Telecorp's policy of rounding up.  Ms. Landry testified that the sales representative told her she would be billed by the second, rather than the minute, the only named plaintiff to recall a specific discussion about billing increments with a sales representative at the point of sale.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. M, Landry Dep. at 28:13-29:5, 80:19-81:3, Ex. 1 at 5, 7).

- Khara Jefferson, on the other hand, said she understood the send to end billing policy when she purchased her service plan.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. U, Jefferson Dep. at 18:12-19:14).

- Ella Linzer ordered her service plan by telephone.  As a result, she did not sign any form agreement, but received the Terms and Conditions in the handset box.  She admittedly failed to pay Telecorp for the cellular service she used and still owes Telecorp more than $1,000.  Rec. Doc. No. 546-13 (Wheeler Decl., Ex. J, Linzer Dep. at 16:15-16, 21:11-25, 27:20-29:24, Ex. 4, 76:2-77:12, & Ex. 10).

- Molly Segura purchased her service plan at a Circuit City store.  She acknowledges receiving Telecorp's Welcome Guide, and is one of the very few named plaintiffs who recalls signing a Telecorp Customer Information Form and Agreement.  Ms. Segura also received credits from Telecorp, and has likely already been compensated in full for her alleged injuries in this case.  Rec. Doc. No. 546-14 (Wheeler Decl., Ex. K, Segura Dep. at 13:5-14, 31:7-32:2, 55:12-22, 75:18-76:9, Ex. 5).

- Jeremiah Magnon also received a credit adjustment from Telecorp.  He is another one of the very few named plaintiffs who recalls receiving a Customer Information Form and Agreement.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. P, Magnon Dep. at 26:14-22, Ex. 4, 43:13-45:3, 54:20-55:4, 58:8-10, Ex. 11); Declaration of Kelly Ransom submitted herewith (Magnon Dep. at 47:1-6).

- Jerry Myers' two-sided contract contains a handwritten notation, reading "Cites 100, 3000 N&W, 19.99/month," referencing a rate plan described in a rate plan brochure.  Mr. Myers is one of the very few named plaintiffs who recalls signing this document (which acknowledges and incorporates the rate plan materials).  Mr. Myers signed the document when he added his wife to his account after receiving service for approximately 18 months and _after_ having full knowledge of the rounding up practice (he called customer service shortly after initially activating service and asked about rounding up).  Moreover, Mr. Myers concedes that he was not financially harmed by rounding up.  Rec. Doc. No.

546-15 (Wheeler Decl., Ex. O Myers Dep. at 8:3-9:19, 20:2-22:4, Ex. 1, 22:5-23:2, 24:22-25:26, 67:19-24, 71:15-72:5).

- Jepera Davis has no memory of the Terms and Conditions, Welcome Guide, or any documents included with the handset box.  Ms. Davis's sales representative asked for her personal information at the point of sale, but she does not remember seeing a contract.  Rec. Doc. No. 546-17 (Wheeler Decl., Ex. W, Davis Dep. at 46:5-47:17, 48:10-49:8, 58:8-59:23).

- Former plaintiff Shelton Mouton acknowledges receiving and understanding the Terms and Conditions, and voluntarily paid his invoices with full knowledge of Telecorp's policies.  Mr. Mouton is also the only named plaintiff known to have signed a Service Agreement acknowledging his receipt and understanding of Telecorp's Terms and Conditions included with the handset box.  Rec. Doc. No. 546-12 (Wheeler Decl., Ex. G, Plaintiff Shelton Mouton's March 18, 2010 Answers to Interrogatories and Responses to Requests for Production).[12]

- Robert Martin was a prepaid customer with Telecorp, and did not sign any form contract.  Unlike the post-paid customers, he did not receive a monthly invoice referencing the customer's acceptance of the Terms and Conditions, and there is no record of his service usage or payment history.  Although he does not remember signing or receiving any documents (other than a receipt), he concedes that he was told that each phone call he made would take minutes off his prepaid card.  Mr. Martin continued his service with Telecorp after full knowledge of the policies.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. R Martin Dep. 21:2-13, 23:15-24:4, 31:16-32:9, 50:15-51:12, 66:10-12, 98:4-99:10, 108:12-17).

- Ronnie Boyde was also a prepaid customer who has no standard form contract or monthly invoices but whose pre-paid card made reference to the Terms and Conditions brochure.  Rec. Doc. No. 546-16 (Wheeler Decl., Ex. S, Boyde Dep. at 14:25-17:22, 23:12-25:12, Ex. 1, 52:24-54:11, 68:11-69:20, Ex. 8).

The differences between class representatives would make any attempt to divide the class

into subclasses impossible.  There would be no way to account for all the differences among the

---

[12] While Shelton Mouton is no longer a named plaintiff, his experience is probative to the predominance analysis.  Just like the remaining named plaintiffs, Mr. Mouton provides a real-world example of the kind of individual issues that will arise during an attempt to try this case as a class action.  *Castano*, 84 F.3d at 744.  Mr. Mouton signed a short-form contract acknowledging his receipt of the Welcome to SunCom and Terms and Conditions brochures, and is thus subject to defenses based on his consent under *Aguillard* and based on the voluntary payment doctrine.  His experience shows that individual issues of causation, contract formation, and consent will predominate over any attempt to show that Telecorp breached its contract with the entire alleged class.  *See, e.g., Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 955 (N.D. Ohio 2009) (concluding individual issues predominated because certain absent class members may be subject to the defense of lack of standing, which would require inspection of those class member's individual circumstances).

class members in the formation of their contract, and specifically whether there was something in that process that constituted a promise to bill by the second:  what they were told, what they understood, what they read, what documents constituted their contract, what handwritten notes were made on such documents, what oral promises were made, and what acknowledgements they signed.  The class representatives alone would give rise to dozens of subclasses, i.e., a subclass of pre-paid customers who received the Terms and Conditions; a subclass of post-paid customers who signed and returned to Telecorp a postcard acknowledging the Terms and Conditions; a subclass of post-paid customers who signed the standard form agreement, thus acknowledging they read their rate plan (which disclosed rounding up); a subclass of post-paid customers who claim they received nothing and were told nothing; a subclass of post-paid customers who received the one-sided customer document Ms. Landry received; a subclass of post-paid customers who received nothing but were told something about how calls would be measured; etc.  Each of <u>those</u> subclasses would have to be further divided depending on whether each class member, like Mr. Myers or Ms. Jefferson, understood the rounding up policy when they received their phone.  Each of <u>those</u> subclasses would have to be further divided depending on whether the class members received credits for amounts they were allegedly over-charged <u>or</u> whether they, like Ms. Linzer, still owe sums to Telecorp.  Subclasses clearly cannot solve Plaintiffs' problems with commonality and predominance.

Moreover, several of the possible subclass definitions on their face defy class treatment, requiring individual inquiry into what each customer was told, what notations were made, and what they knew from prior experience.  Plaintiffs' experiences are too diverse to be certified. *Mann v. GTE Mobilnet of Birmingham Inc.*, 730 So. 2d 150 (Ala. 1999); *see also* Rec. Doc. No. 546 at 15-16 (citing cases).

## 2.    Plaintiffs' Cursory Evidence Is Insufficient to Meet Their Burden

Plaintiffs' and their experts' argument that *no one* would have consented to rounding up is both factually inaccurate and fails to satisfy the rigorous analysis of whether common issues predominate.  This analysis requires an examination of the merits to the extent they overlap with class certification questions.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

Rounding up was and is ubiquitous to telecommunications service, and has been recognized as a standard billing practice by the FCC and multiple courts.  The FCC has approved rounding up, rejecting a consumer's argument that rounding up was unreasonable or unfair, emphasizing that billing in whole minute increments is "the most common billing practice."  *In re Petition for Declaratory Ruling on Issues Contained in Count I of White v. GTE Class Action Complaint*, 16 F.C.C.R. 11558, ¶ 19 (2001).  If anything, reasonable customers should *expect* rounding, not the other way around:  "no reasonable customer could actually believe that each and every phone call she made terminated at the end of each full minute, [and thus] must be aware that MCI charges in full-minute increments only."  *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997); *see also Porr v. NYNEX Corp.*, 660 N.Y.S.2d 440, 447 (App. Div. 1997) ("[N]o reasonable consumer would have been deceived into believing that he was being billed by the second, when his monthly statements contained no charges for calls of less than a full minute"); *Mobley v. AT&T Corp.*, 717 So. 2d 367, 368 (Ala. 1998) (same); *Marcus v. AT&T Corp.*, 938 F. Supp. 1158, 1174 (S.D.N.Y. 1996) ("AT&T's failure to disclose the exact duration of the calls on its bills also is not materially misleading because no consumer reasonably could believe that a designation of a call in whole minutes accurately reflects the length of that call"); *Weinberg v. Sprint Corp.*, 173 N.J. 233, 244-45, 801 A.2d 281 (2002) (same).

Thus, even putting aside the various ways rounding up was disclosed and the absence of any promise to bill by the second, any customers with prior wireless service (or even prior long-distance service) would have known about rounding up, presumably would have expected Telecorp to round up, and therefore consented to the practice. *See, e.g.,* Rec. Doc. No. 546-18 (Wheeler Decl., Ex. Y, Adams Dep. at 38:5-40:13). Indeed, the declarations signed by a few of the named plaintiffs and their experts demonstrate the lack of commonality and predominance. Some named plaintiffs and the experts apparently had an understanding entirely different than some other named plaintiffs and courts throughout the nation, which creates an individual issue of fact among class members.

However, the assertion of a few of the named Plaintiffs that they "understood" they would receive unrounded minutes, even if true, does not create a contractual promise by Telecorp to bill in one second increments. A breach of contract claim founded on one party's "understanding" of a contract but unsupported by any contract term should fail as a matter of law. But even if a subjective "understanding" could be the basis for a breach of contract claim, this would create yet another individualized issue of fact that would preclude class certification. While some class members might have had this understanding, many would not. What any class member understood would vary based on his or her prior experience with wireless carriers, what materials were reviewed, what he or she was told, and any number of other surrounding facts and circumstances. Plaintiffs' efforts to suggest that common issues will predominate have thus only managed to raise more individual issues.

### 3. Individual Issues Regarding the Meaning of Contract Terms Would Predominate at Trial

Telecorp's rate plans and Terms and Conditions expressly provide for rounding up. Plaintiffs point to handwritten notes on the front page of contractual documents received by two

(and by no means all) customers, such as "Loc. 300" and "Cities 100," as evidence of a promise to bill by the second.  Rec. Doc. No. 577-3 at 2 & 4.  Plaintiffs suggest that each of these documents serve as a basis for a subclass.  The Court's denial of Telecorp's motion for summary judgment indicates a question of fact about the terms of each customer's contracts.  Resolving this question of fact and determining the content of each customer's contract will also raise individual issues that cannot be tried on common evidence.

It is not enough for Plaintiffs to prove a common practice in a breach of contract case. They must also be able to prove the contract's terms on a class-wide basis.  The burden is on Plaintiffs.  Yet when terms of written contracts are ambiguous, Louisiana allows consideration of extrinsic evidence.  La. Civ. Code Ann. art. 1848; *Campbell v. Melton*, 2001-2578 (La. 5/14/02), 817 So. 2d 69, 75 (considering parol evidence to determine intent of parties where contract term is ambiguous); *Dixie Campers, Inc. v. Vesely Co.*, 398 So. 2d 1087 (La. 1981) (same).  To interpret the contract and decide whether rounding up constituted a breach, the trier of fact will need to decide what the terms of the contract are and what they mean.  This analysis — like the analysis of consent — will require looking at the customer's individual circumstances to determine the parties' intent and the meaning of contract terms.

If Plaintiffs' cause of action turns on each plaintiffs' "understanding" or on the meaning of handwritten notes on certain contracts (for those plaintiffs who, unlike Claudia Fontenot and others, had such a signed document) made by individual sales representatives, then Rule 23 does not permit considering all claims together.  Handwritten notes made by numerous different sales representatives are by definition not common.  Uncovering what each notation means will require evidence about what the sales representative told the customer, what the customer understood, and the language in the customer's rate plan, which is expressly referenced and

incorporated in the standard form agreement and Terms and Conditions.  If this inquiry was sufficiently unclear that summary judgment was inappropriate, then it is certainly not clear enough to resolve on the basis of two customers who received documents with handwritten notes and several other customers who do not know what they received <u>or</u> who have testified they did <u>not</u> receive those documents.  Individual issues predominate when the terms of each class member's contract differ.  *Mann v. GTE Mobilnet of Birmingham Inc.*, 730 So. 2d 150, 153 (Ala. 1999) (if contract was not clear, class could not be certified because court would have to "question every putative class member about his or her understanding of the [contract term] … to decide whether that customer's contract was breached"); see also Rec. Doc. No. 546 at 15-16 (citing cases).

### 4.  Individual Issues Will Predominate When Trying Telecorp's Defenses

When deciding class certification, courts must also consider how defenses will be resolved.  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  The Court has recognized that some customers will need to arbitrate their claims.  But other defenses in this case raise individual issues that will have to be adjudicated at trial.

The existence of damage or injury is an essential element of a breach of contract claim. *See* La. Civ. Code Ann. art. 2315; *Long v. Charles Kaufman Co.*,  122 La. 281, 47 So. 606 (1908) (injury must be proven before damages may be awarded).  Plaintiffs and their expert emphasize that Telecorp rounded up airtime for everyone.  But the predominance inquiry also asks whether the trier of fact can determine whether a class member suffered injury on common evidence (assuming any class could be identified whose contracts included a promise to bill by the second).  Because that is not possible, no class should be certified.

Ella Linzer, for example, paid Telecorp less than $25 during her short term of service, but owed Telecorp over $1,000 when her service was terminated.  Rec. Doc. No. 546-13 (Wheeler

Decl., Ex. J, Linzer Dep., 76:2-77:12, Dep. Ex. 10).  Far from being injured she owes Telecorp a significant amount.  Other customers, such as Mr. Magnon and Ms. Segura, received credits from Telecorp that may have already compensated them for any injury.  Rec. Doc. No. 546-14 & -15 (Wheeler Decl., Exs. P, Magnon Dep. 43:13-45:3, 54:20-55:4, 58:8-10, Dep. Ex. 11, & K, Segura Dep. 75:18-76:9).  Mr. Myers and Mr. Martin waived claims against Telecorp by adding lines of service, renewing their contracts, or purchasing additional prepaid cards after they knew of Telecorp's policies.  Rec. Doc. No. 546-15 (Wheeler Decl., Exs. O, Myers Dep. 20:2-22:4, Dep. Ex. 1, & R, Martin Dep. 31:16-32:9).  Mr. Mouton voluntarily paid (even before renewing a contract) with full knowledge of the policies because he signed documents acknowledging he understood the Terms and Conditions.  *Whitehall Oil Co. v. Boagni*, 255 La. 67, 76, 229 So. 2d 702 (1969) (Louisiana recognizes general principle that "when one with full knowledge of the circumstances involved voluntarily pays an amount not actually owed he cannot thereafter claim the payment back").  Mr. Myers did not suffer injury from Telecorp's practices because he admittedly never paid any charges for airtime usage in excess of his allotted minutes.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. O, Myers Dep. 67:19-24, 71:15-72:5).  This defense of lack of injury is highly individual and involves complicated analysis of individualized evidence.  It requires month-by-month manual analysis of each customer's billing statements to identify the customer's rate plan(s) and applicable "buckets" and then to determine whether the customer exceeded his or her bucket in each particular month.  It also requires analyzing each customer's bills to determine whether charges were paid, unpaid, or credited off of a subsequent bill to compensate for charges due to rounding up.  Rec. Doc. No. 546-28, Voth Declaration ¶¶ 7-25.

Rule 23 does not allow the Court to ignore these issues.  Barring Telecorp from presenting its defenses would violate Telecorp's due process rights.  Whether customers owed

money or renewed service or made payment with full knowledge of rounding will also require individual evidence unsuitable to class treatment.

### C.    The Named Plaintiffs Are Not Typical of the Putative Class

Typicality requires the named plaintiffs' claims, defenses and experiences to be typical of the class. *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 598 (E.D. La. 2002).  Plaintiffs here are atypical.

There are profound differences between the various class representatives (i.e., Mr. Myers renewed his contract after understanding that Telecorp rounded up, Ms. Linzer owes money to Telecorp to this day).  Plaintiffs have alleged (it appears) two classes of customers:  one that received a form document with Terms and Conditions, and one that received a form without Terms and Conditions.  Several named plaintiffs, however, testified they received ***nothing*** from Telecorp but the phone and a receipt.  Rec. Doc. No. 546-15 (Wheeler Decl., Exs. N, Fontenot Dep. 60:12-62:5 & R, Martin Dep. 108:12-17).  Others cannot recall what they received.  Rec. Doc. No. 546-15 (Wheeler Decl., Exs. L, Donald Ledet Dep. 38:24-39:10, M, Landry Dep. 35:7-14, Q, Guilbeau Dep. 11:16-24, 53:14-18, & R, Martin Dep. 23:15-24:4, 98:4-99:10, 108:12-17).  These individuals do not fit within either definition proposed by Plaintiffs, and they cannot represent the customers within those putative classes.[13]  It is also clear that the named plaintiffs are demonstrably different from some of the absent class members they purport to represent.  For example, Shelton Mouton, the former named plaintiff who voluntarily dismissed his claims, signed and returned a card that stated:

> this Service Agreement shall be read in connection with the terms and conditions included with your handset and posted on our website at www.SunCom1.com as well as any rate plans, promotional materials or

---

[13] Moreover, there is only scant evidence regarding use of the form that lacked Terms and Conditions. Providing such a form would contradict Telecorp's policy to provide Terms and Conditions to all customers.  Triche Decl. ¶ 22; Affidavit of Forrest Ashworth.

> other documentation provided to you by SunCom (collectively the 'Sales Information'), the terms of which are incorporated herein by reference.  If you would like additional copies of the Sales Information please contact SunCom Customer Care or visit any SunCom sales location. . . . **I have read and understood the Welcome to SunCom and Terms and Conditions brochures contained in my handset box**.

Rec. Doc. No. 546-12 (Wheeler Decl., Ex. G) (box checked and postcard signed by Shelton Mouton) (emphasis added).

Other class representatives who did receive materials from Telecorp are not typical because their experiences raise unique defenses.  Ms. Linzer admittedly declined to pay Telecorp for her service and owes more than $1,000.  Rec. Doc. No. 546-13 (Wheeler Decl., Ex. J, Linzer Dep. 76:2-77:12, Dep. Ex. 10).  Mr. Myers, who admits Telecorp did not financially harm him, similarly raises unique issues and cannot represent a class of subscribers who allege Telecorp did injure them.  Rec. Doc. No. 546-15 (Wheeler Decl., Ex. O, Myers Dep. 67:19-24, 71:15-72:5).

The variety of experiences among the 15 class representatives shows only that there is nothing "typical" about any of their claims.

## III.    CONCLUSION

Despite multiple opportunities to state an actionable claim that can be certified as a class action, Plaintiffs can show no breach of contract and cannot satisfy key elements of Rule 23, including commonality, predominance and typicality.  Their motion to certify a class should be denied.

Respectfully submitted,

/s/   Elizabeth S. Wheeler

| | |
|---|---|
| KELLY TWISS NOONAN (WA Bar 19096) | JOSEPH E. LEBLANC, JR., T.A. (#8199) |
| MATHEW L. HARRINGTON (WA Bar 33276) | LEBLANC BLAND, P.L.L.C. |
| STOKES LAWRENCE, P.S. | 1717 St. James Place, Ste. 360 |
| 800 Fifth Avenue, Suite 4000 | Houston, Texas 77056 |
| Seattle, WA 98104-3179 | Telephone:  (713) 627-7100 |
| Telephone:  (206) 892-2109 | Facsimile:  (713) 627-7248 |
| kelly.noonan@stokeslaw.com | jleblanc@leblancbland.com |
| mathew.harrington@stokeslaw.com | |

and

ELIZABETH S. WHEELER (#21148)
LEBLANC BLAND, P.L.L.C.
909 Poydras Street, Ste. 1860
New Orleans, Louisiana 70112
Telephone:  (504) 528-3088
Facsimile:  (504) 586-3419
ewheeler@leblancbland.com

Attorneys for Defendant
Telecorp Communications, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2011, the above and foregoing pleading was

electronically filed using the CM/ECF system which will send a notice of electronic filing to

counsel for all parties to this proceeding.

s/ Elizabeth S. Wheeler          